**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISON**

| | | |
|---|---|---|
| ROGER ALLEN WALKER, | ) | CASE NO. 4:20-CV-02506-CEH |
| | ) | |
| Plaintiff, | ) | CARMEN E. HENDERSON |
| | ) | UNITED STATES MAGISTRATE JUDGE |
| v. | ) | |
| | ) | MEMORANDUM OF OPINION & ORDER |
| COMMISSIONER OF SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| | ) | |
| Defendant, | ) | |

## I. Introduction

Plaintiff, Roger Allen Walker ("Walker" or "Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying his application for a period of disability and Disability Insurance Benefits ("DIB"). This matter is before me by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF No. 21). For the reasons set forth below, the Court AFFIRMS the Commissioner's final decision denying Walker Disability Insurance Benefits.

## II. Procedural History

On October 2, 2017, Claimant filed an application for DIB, alleging a disability onset date of February 14, 2000.  (ECF No. 13, PageID #: 299). The application was denied initially and upon reconsideration, and Claimant requested a hearing before an administrative law judge ("ALJ"). (ECF No. 13, PageID #: 190-191).  On January 16, 2020, an ALJ held a hearing, during which Claimant, represented by counsel, and an impartial vocational expert testified. (ECF No. 13, PageID #: 100-138).  On March 2, 2020, the ALJ issued a written decision finding Claimant

1

was not disabled. (ECF No. 13, PageID #: 81-99). The ALJ's decision became final on September 5, 2020, when the Appeals Council declined further review. (ECF No. 13, PageID #: 70-75).

On November 6, 2020, Claimant filed his Complaint to challenge the Commissioner's final decision. (ECF No. 1). The parties have completed briefing in this case. (ECF Nos. 16, 19, 21). Claimant asserts the following assignments of error:

> 1. The appointment of Andrew Saul as Commissioner of the Social Security Administration violated the separation of powers. As such, the decision in this case by an ALJ who derived his authority from Andrew Saul was constitutionally defective.
>
> 2. The ALJ committed harmful error when she failed to find a severe impairment at Step Two of the Sequential Evaluation.

(ECF No. 16 at 1).

## III. Background

### A. Claimant's symptom testimony

The ALJ summarized Claimant's symptom testimony:

> The claimant initially alleged disability due to multiple issues, including head injuries affecting speech and concentration, nervous condition, anxiety, spinal problems, trauma to the right ear, ringing in both ears, PTSD, depression, heart problems, neurogenic shock, left leg and knees lock up, bowel problems, social anxiety, stomach problems, metabolic problems, extremely sensitive to light, severe itching, and trouble sleeping (Exhibit 3E). He submitted a Function Report wherein he reported difficulties lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, stair climbing, seeing, remembering, completing tasks, concentrating, understanding, following instructions, using his hands and getting along with others (Exhibit 4E). He endorsed musculoskeletal, cognitive, and neurological issues, causing him chronic pain, a perpetual concussed state, and decreased concentration (Exhibit 4E).
>
> At the hearing, the claimant testified that he is married and

currently lives with his wife. He stated that he has a driver's license and drives once or twice a week as needed. He endorsed a BA in Education and a history of military service. The claimant testified that he has suffered from headaches since his early 20s. During the relevant time period, he stated that his headaches never let up and caused sensitivity to light. He testified that he had good days and bad days, and that at times he could not get out of bed, due to his pain. He endorsed his headaches occurring three to four times a week. He further stated that, at one point his medications seemed to be helping, but they caused him to have very bad violent dreams. He stated that he has never slept well and does not sleep through the night.

The claimant also endorsed an ankle fracture. He stated that if it locks up, he hits the ground hard. When questioned how often his occurs, the claimant stated once or twice a month. He also stated that he twisted his back up and that he used a cane, but hide it from others. He also endorsed difficulties concentrating since 2000, stating that he kept notes in his pocket to help him remember things. He testified that while getting his Master's Degree, he had a breakdown and did not report it. He endorsed chest anxiety and crying spells, but stated that he hide it from everyone. Due to his conditions, he stated that he did not do anything around the house.

(ECF No. 13 at 89).

## B. Relevant Medical Evidence

The ALJ also summarized Claimant's health records and symptoms:

i.    Headaches

While the record does support a diagnosis of headaches/migraines, there is simply no evidence of any more than minimal limitations related thereto during the relevant time period.

A CT of the claimant's brain performed in February 2000, showed no evidence of focal findings (Exhibit 3F/281). Subsequently, in July 2003, the claimant presented to the VA complaining of headaches, which he associated with head trauma while in the service (Exhibit 7F/185). At that time, he reported getting headaches "a couple of times every month," lasting 6 hours with associated photophobia (Exhibit 7F/185). He denied any other symptoms, including diploma and dizziness. It was noted that he was under some stress, studies extensively, and "does not believe in taking meds as doesn't want to take any meds for H/A" (Exhibit

7F/185). A physical examinations showed the claimant to be alert, fully oriented, an in no acute distress, with a supple neck without tenderness. He was assessed with "H/A" and referred to neurology (Exhibit 7F/186).

In October 2003, the claimant presented "for the first time" to the neurology outpatient clinic through the VA (Exhibit 7F/168). At that time, he reported having headaches since 1992, which worsened since 1998. He reported a few prior black out episodes, but it was not noted when, and he denied dizziness and lightheadedness. It was noted that he was going to school through the VA. A physical examination showed the claimant to be alert and fully oriented, with normal speech and language, symmetric face, 5/5 strength in all four extremities, normal muscle tone and reflexes, intact sensations in all extremities, no pronator drift, intact coordination, and a normal gait (Exhibit 7F/169). It was noted that the claimant's reported chronic daily headaches were most consistent with migraine headaches. No cause for repeated imaging studies were found, as his "headaches have not really changed much in intensity and nature" (Exhibit 7F/169). He was started on Nortriptyline 25mg, which was noted would be increased to 50 mgs two weeks later, and 75mg two weeks after that, as well as Motrin 400mg (Exhibit 7F/169).

In February 2004, the claimant returned to the VA for a neurological headache follow up, at which time it was noted he was restarted on Nortriptyline in October 2003, "which relieved his headaches" (Exhibit 3F/114). A physical examination performed at that time showed the claimant to be alert, with normal speech, 5/5 strength, normal muscle tone and strength, normal coordination, and a normal gait (Exhibit 3F/114). His "chronic daily headaches" were noted to be "well controlled" since last visit in October 2003, and he was informed that he could get his headache medication from his primary care physician, since his headaches were "stable" (Exhibit 3F/114).

(ECF No. 13, PageID #: 90).

  ii.  PTSD

The claimant also alleges disability due, in part, to several mental health issues; however, there is no evidence of any acceptable mental health diagnosis, no evidence of any objective abnormal mental health findings, and no evidence of any mental health treatment during the relevant time period. In February 2001, it is noted that a depression and PTSD screen was positive, but no

4

specific objective findings were made and no mental diagnosis was made (Exhibit 7F/192). The claimant's representative points out that in a VA record dated March 2001, "pain disorder associated with both psychological and general medical condition" is listed, but just below such condition, it is noted that the code associated with that term was "inactive" and there is no evidence of any associated abnormal objective findings found at that time to support such condition (Exhibit 7F/3).

In March 2003, the claimant's provider mentions that the claimant suffers from some psychiatric issues, but no objective abnormal mental findings were made and the only assessment/diagnosis made at that time was low back pain (Exhibit 7F/176). In February 2004, it was noted that the claimant "admits to symptoms of depression," but no abnormal mental findings were made and no mental diagnosis was made (Exhibit 3F/114). Subsequently, in May 2007, long after the date last insured, the claimant first presented for mental health care, at which time, he denied any previous mental health history (Exhibit 3F/234).

(ECF No. 13, PageID #: 87-88).

iii.    Spinal Issues

While the record does support low back pain/minimal osteoarthric changes and minimal lumbar bulging and loss of height and signal at L4-5, there is simply no evidence of any more than minimal limitations related thereto during the relevant time period. Specifically, lumbar studies performed in February 2000 were "normal" (Exhibit 3F/282). A MRI of the claimant's lumbar spine performed in April 2002, showed completely normal findings (Exhibit 3F/113, 276). Subsequently, a MRI of the claimant's lumbar spine performed in November 2003, showed a large hemangioma within the T11 vertebral body, "minimal" loss of height and signal at the L4- L5 intervertebral level, and "minimal" bulging at L4-L5, with no fractures, no canal or foraminal narrowing (Exhibit 3F/113). This study was in interpreted as "unremarkable" (Exhibit 3F/149). A repeated MRI performed in December 2003, showed no change and was again noted to be "unremarkable" (Exhibit 3F/272).

In March 2003, the claimant presented to the VA for low back pain (Exhibit 7F/176). However, he reported that "he is very strong in his back" and he refused to take any medications for it (Exhibit 7F/175). He also reported that he was taking MSM and glucosamine and chondroitin sulfate which he reported helped his

pain (Exhibit 7F/175). A full physical examinations [sic] performed at that time showed the claimant to be in no acute distress, with 5/5 strength and normal sensations (Exhibit 7F/176). It was noted that he presented with an antalgic gait, but it was specifically noted, "this seems to be a robotic antalgia, as he moves very slowly to demonstrate his amount of pain" (Exhibit 7F/176). The only assessed made was chronic low back pain" and no medications were provided (Exhibit 7F/176).

In September 2003, the claimant returned to the VA for low back pain (Exhibit 7F/167). He reported experiencing pain, which he associated to his military service and episodic bowel incontinence (Exhibit 7F/167). At that time, it was noted that x-rays revealed normal disk spaces and "minimal" osteoarthric changes (Exhibit 7F/167). He subjectively reported some slight numbness in the L4 distribution, but a physical examinations [sic] showed intact sensations throughout, intact 5/5 strength throughout, no sacroiliac joint tenderness, and negative straight leg rises (Exhibit 7F/167). He had "diffuse tenderness" over his back and it was noted that he had a very antalgic gait (Exhibit 7F/167). However, as detailed above, just one month later, in October 2003, and again in February 2004, the claimant was assessed with a normal gait (Exhibits 3F/113 and 7F/168). The only assessment made at that time was "low back pain" and physical therapy, exercise, and anti-inflammatories were recommended (Exhibit 7F/168). It was specifically noted that his provider informed him that his examination and imaging studies did not show any evidence of compression or impingement of his nerves, and that it did not appear that his reported episodes bowel incontinence was not coming from his back (Exhibit 7F/168).

Subsequently, in October 2004 (seven months after the date last insured), the claimant presented for a physical therapy consult through the VA (Exhibit 3F/112). At that time, he reported pain with long sitting, walking, and lifting weight "about 100lbs like holding shingles over the shoulder" but he stated that he was not taking any medications for his reported back pain (Exhibit 3F/113). It was noted that he appeared with a cane, and despite reporting pain with long sitting, it was noted that the claimant waited for several hours for his appointment and sat in one place for most of the time (Exhibit 3F/113). A physical examination showed that the claimant could walk on his tiptoes and heels most of the time and squat with little difficulty. He had 5/5 strength, negative straight leg rises, and a positive Wadell sign with axial loading and "sham rotation of spine" (Exhibit 3F/113). Based upon these findings, he was referred to physical therapy and neuropsychological testing to

6

rule out nonorganic causes of his lower back pain (Exhibit 3F/113).

(ECF No. 13, PageID #: 91-92).

    iv.    Stomach Issues

In July 2002, an ultrasound showed a considerable amount of stool consistent with the diagnosis of constipation (Exhibit 3F/151). [ ] An ultrasound performed in November 2002, showed a fatty liver with probable spurring within the gallbladder (Exhibit 3F/15).

(ECF No. 13, PageID #: 92).

    v.    Obesity

The evidence reflects that the claimant was 6'0" and weighed approximately 261 pounds, during the relevant time period, resulting in a BMI of 42.4 (Exhibit 7F/7).

(ECF No. 13, PageID #: 92).

**IV.**    **The ALJ's Decision**

The ALJ made the following findings relevant to this appeal:

3. Through the date last insured, the claimant had the following medically determinable impairments: headaches/migraines; low back pain/minimal osteoarthric changes and minimal lumbar bulging and loss of height and signal at L4-5; constipation; fatty liver; and obesity (20 CFR 404.1521 et seq.).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that significantly limited the ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant did not have a severe impairment or combination of impairments (20 CFR 404.1521 et seq.).

5. The claimant was not under a disability, as defined in the Social Security Act, at any time from February 14, 2000, the alleged onset date, through March 31, 2004, the date last insured (20 CFR 404.1520(c)).

**V. Law & Analysis**

**A. Standard of Review**

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

**B. Standard for Disability**

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the

claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.*

## C. Discussion

Claimant raises two issues on appeal. The first issue attacks the constitutionality of the decision on the basis that it was determined by an ALJ whose authority was delegated to her by Andrew Saul, whose service as commissioner violated the separation of powers. In his second issue, Claimant asserts that the ALJ erred when she found that he had no severe impairments at step two of the sequential analysis.

### 1. Claimant Walker lacks standing to challenge the ALJ's decision based on alleged separation of powers by the Commissioner.

Claimant asserts that "[b]ased on the fact that Andrew Saul's tenure as Commissioner of SSA was unconstitutional, and he was Commissioner at the time of the ALJ and Appeals Council decisions, this matter should be remanded for a *de novo* hearing." (ECF No. 16 at 9). Claimant argues that because Acting Commissioner Saul was unconstitutionally appointed, the authority he delegated to the ALJ to hear and ultimately determine Claimant's application for disability benefits was also unconstitutional. (ECF No. 16 at 8, ECF No. 21 at 4). In support of this argument, Claimant cites to *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020) for the proposition that Saul's appointment under 42 U.S.C. § 902(a) violates the separation of powers because it

limits the President's authority to remove the Commissioner without cause. The Commissioner does not dispute that the relevant removal provision "violates the separation of powers to the extent it is construed as limiting the President's authority to remove the Commissioner without cause." (ECF No. 19 at 3 (citing Office of Legal Counsel, U.S. Dep't of Justice, Constitutionality of the Commissioner of Social Security's Tenure Protection, 2021 WL 2981542 (July 8, 2021)). Citing *Collins v. Yellen*, 141 S. Ct. 1761, 1787-89 (2021), the Commissioner argues that Walker is not entitled to relief because "even where an unconstitutional statutory removal restriction exists, a plaintiff seeking relief on that basis must show that the restriction actually caused [him] harm." (ECF No. 19 at 3). Specifically, the Commissioner argues that Walker cannot show harm to support his claim for relief because the ALJ's appointment was ratified by an Acting Commissioner who was not subject to the challenged removal restriction, and because Walker cannot show that the removal restriction caused the denial of his benefits. (ECF No. 19 at 3-4).

As a threshold matter, the Court must first determine whether Walker has standing to challenge the alleged unlawful removal provision. The Commissioner does not specifically contest Walker's standing. (ECF No. 19). However, even if the parties do not challenge standing, "federal courts have a duty to consider their subject matter jurisdiction in regard to every case and may raise the issue sua sponte." *Answers in Genesis of Kentucky, Inc.* v. *Creation Ministries Int'l, Ltd*., 556 F.3d 459, 465 (6th Cir. 2009).

To establish Article III standing, a plaintiff must show that he or she has suffered an "injury in fact" that is "fairly traceable" to the defendant's conduct and would likely be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992) (alterations and internal quotation marks omitted). "[F]or purposes of traceability, the relevant inquiry is whether the plaintiffs' injury can be traced to allegedly unlawful conduct of

the defendant, not to the provision of law that is challenged." *Collins*, 141 S. Ct. at 1779 (internal quotation marks and citation omitted).

First, Walker argues that he has standing because the commissioner "failed to proffer any argument" that he lacked standing. (ECF No. 21 at 2). However, "[a]s a jurisdictional requirement, standing ... *cannot be waived or forfeited*." *Virginia House of Delegates v. Bethune-Hill*, ___ U.S. ___, 139 S. Ct. 1945, 1951, 204 L.Ed.2d 305 (2019) (emphasis added).

Next, Walker argues that he has standing as a "disability claimant who [] received an unfavorable decision during the administrative process[.]" (ECF No. 21 at 2 (citing *Brinkman v. Kijakazi*, 2021 WL 4462897, at *2 (D. Nev. Sept. 9, 2021) and *Sylvia v. Kijakazi*, 2021 WL 4692293, at *3 (N.D. Tex., Sept. 13, 2021)). Contrary to Walker's argument, in *Brinkman*, the court found that the plaintiff lacked standing to bring the constitutional challenge by failing to "allege facts that support a finding that her injury, the denial of disability benefits, can be or is traced to the conduct of the SSA Commissioner." 2021 WL 4462897, at *2. Citing to *Collins* and *Seila Law*, the court explained: "Because Plaintiff offers nothing that traces the decision by the ALJ in her case to any alleged injurious conduct by the SSA Commissioner, she has not demonstrated traceability and her constitutional violation claim fails for lack of standing." *Id*. (citing *Seila Law*, 140 S.Ct. at 2196 and *Collins*, 141 S. Ct. at 1779). Thus, *Brinkman* does not support Walker's argument.

In *Sylvia*, however, the court found that "[p]laintiff's separation-of-powers claim is both traceable and redressable such that she has standing to pursue it." *Sylvia A. v. Kijakazi*, No. 5:21-CV-076-M-BQ, 2021 WL 4692293, at *4 (N.D. Tex. Sept. 13, 2021), *report and recommendation adopted*, No. 5:21-CV-076-M-BQ, 2021 WL 4622528 (N.D. Tex. Oct. 7, 2021). The court explained that the traceability requirement was met "[b]ecause the ALJ derives

11

authority directly from the Commissioner, and the ALJ's disability determination becomes the Commissioner's final decision." 2021 WL 4692293, at *3. In so finding, the court observed that "'[i]f the removal protections afforded the Commissioner violate the constitutional requirement of separation of powers, the Commissioner has no authority to delegate.'" *Id*. (quoting *Tafoya v. Kijakazi*, No. 21-CV-00871-REB, 2021 WL 3269640, at *5 (D. Colo. July 29, 2021)). *Sylvia's* conclusion, however, directly conflicts with the Supreme Court's conclusion in *Collins* that the unlawfulness of a similar removal provision did not strip the relevant executive officer "of the power to undertake the other responsibilities of his office." 141 S. Ct. at 1788 n. 23 (citing *Seila Law*, 140 S. Ct. at 2207-2211). Accordingly, this Court does not find *Sylvia* to be persuasive. *See Rives v. Comm'r of Soc. Sec*., No. 1:20-CV-02549, 2022 WL 1076216, at *22 (N.D. Ohio Feb. 4, 2022), *report and recommendation adopted*, No. 1:20CV2549, 2022 WL 681273 (N.D. Ohio Mar. 8, 2022); *Reese v. Comm'r of Soc. Sec. Admin*., No. 5:20-CV-2385, 2022 WL 1090538, at *17 (N.D. Ohio Jan. 31, 2022), *report and recommendation adopted*, No. 5:20CV2385, 2022 WL 831122 (N.D. Ohio Mar. 21, 2022).

The mere receipt of an unfavorable decision is not sufficient to establish harm traceable to the alleged unlawful conduct. The majority of courts having examined this issue have concluded that a party similarly situated to Claimant lacks standing by failing to allege facts supporting that the denial of disability payments could be traced to the conduct of the Commissioner of the Social Security Administration. *See Sean E. M. v. Kijakazi*, No. 20-CV-07295-SK, 2022 WL 267406, at *3 (N.D. Cal. Jan. 28, 2022) (citing *Miley v. Comm'r of Soc. Sec*., 2021 WL 6064754, at *9 (N.D. Ohio Dec. 22, 2021) (rejecting argument that plaintiff had standing because her administrative proceedings were conducted pursuant to policies and regulations implemented by the Commissioner, finding that plaintiff lacked standing absent a

harm traceable to an unlawful action by the Commissioner); *Melvin S. v. Comm'r of Soc. Sec.*, 2021 WL 6072564, at *10-11 (W.D. Wash. Dec. 22, 2021); *Rivera-Herrera v. Kijakazi*, 2021 WL 5450230, at *8 (E.D. Cal. Nov. 22, 2021); *Catherine J.S.W. v. Comm'r of Soc. Sec.*, 2021 WL 5276522, at *7 (W.D. Wash. Nov. 12, 2021) (rejecting the argument that "all of the ALJ's who conducted hearings would have been biased because they were tainted by the alleged separation of powers violation"); *Amanda B. v. Comm'r of Soc. Sec.*, 2021 WL 4993944, at *9 (D. Or. Oct. 26, 2021) ("Because Plaintiff offers nothing that traces the decision by the ALJ in her case to any alleged injurious conduct by the SSA Commissioner, she has not demonstrated traceability and her constitutional violation claim fails for lack of standing."); *Brinkman v. Kijakazi*, 2021 WL 4462897, at *2 (D. Nev. Sept. 29, 2021)); *see also Rives*, 2022 WL 1076216, at *20 (collecting cases); *Reese*, 2022 WL 1090538, at *15 (collecting cases); *Turk v. Comm'r of Soc. Sec.*, No. 1:20-CV-02157-JRA, 2021 WL 6755002, at *11 (N.D. Ohio Dec. 23, 2021), *report and recommendation adopted*, No. 1:20CV2157, 2022 WL 280454 (N.D. Ohio Jan. 31, 2022); *Rhouma v. Comm'r of Soc. Sec.*, --- F.Supp.3d ---, 2021 WL 5882671, at *10 (N.D. Ohio Dec. 13, 2021); *Brunton v. Comm'r of Soc. Sec.*, No. 5:20-CV-2233, 2021 WL 8016911, at *22 (N.D. Ohio Dec. 9, 2021), *report and recommendation adopted sub nom. Brunton v. Kijakazi*, No. 5:20-CV-2233, 2022 WL 950446 (N.D. Ohio Mar. 30, 2022).[1]

---

[1] Another court in this district has directly evaluated the issue of plaintiff's harm and not as a matter of standing. *See ADRIANNA R HABER, v. COMMISSIONER OF SOCIAL SECURITY*, No. 4:21-CV-1038, 2022 WL 1205383 (N.D. Ohio Apr. 6, 2022); *Lynch v. Comm'r of Soc. Sec.*, No. 1:21-CV-00556-JDG, 2022 WL 614777, at *17 (N.D. Ohio Mar. 2, 2022); *Klapp v. Comm'r of Soc. Sec. Admin.*, No. 5:20-CV-02850-JDG, 2022 WL 310228, at *15 (N.D. Ohio Feb. 2, 2022); *Colbert v. Comm'r of Soc. Sec.*, No. 5:20-CV-2234, 2021 WL 7286802, at *12 (N.D. Ohio Nov. 23, 2021), *report and recommendation adopted sub nom. Colbert v. Comm'r of Soc. Sec. Admin.*, No. 5:20-CV-2234, 2022 WL 556738 (N.D. Ohio Feb. 24, 2022). Nonetheless, in each of the cases, the court concluded that plaintiff had not demonstrated compensable harm stemming from the unconstitutional provision.

Walker has failed to show compensable harm connected to the unconstitutional removal provision. Walker asserts that "based on the fact that Andrew Saul's tenure as Commissioner of SSA was unconstitutional, and he was Commissioner at the time of the ALJ and Appeals Council decisions, this matter should be remanded for a de novo hearing." (ECF No. 16 at 9). However, "the fact that the removal restriction in § 902(a)(3) is unconstitutional does not entitle [Walker] to a remand for a new hearing and decision in his case." *Klapp v. Comm'r of Soc. Sec. Admin.*, No. 5:20-CV-02850-JDG, 2022 WL 310228, at *15 (N.D. Ohio Feb. 2, 2022). As the Supreme Court in *Collins* found, "there is no basis for concluding that any head of the FHFA lacked the authority to carry out the functions of the office" because the removal restriction was unconstitutional. 141 S. Ct. at 1788 ("unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office, including implementing the third amendment," citing *Seila Law*, 140 S. Ct. at 2207–2211).

Walker asserts that "[t]he ALJ in this matter decided this case based on regulations promulgated by Mr. Saul when he had no authority to issue the same. This means that a presumptively inaccurate legal standard was utilized by the ALJ to adjudicate this claim." (ECF No. 16 at 8). However, Walker fails to explain which regulations Mr. Saul promulgated that the ALJ used to decide his case. Moreover, Walker's argument that Mr. Saul had no authority to carry out the functions of office because the removal restriction was unconstitutional was rejected by the Supreme Court in *Collins*. 141 S. Ct. at 1788.

In his reply brief, Walker asserts that Mr. Saul "modified the way in which musculoskeletal impairments are evaluated (DI 34121.013 and DI 34121.015)." (ECF No. 21 at 3). However, POMS DI 34121.013 and 34121.015 became effective in April 2021 and Walker fails to explain how the changes impacted his 2017 application or 2020 hearing and decision.

Walker asserts that "while Mr. Saul was Commissioner, he implemented changes in HALLEX which modified the way in which decisions were written (I-2-3-20 in effect July 17, 2019)." (ECF No. 21 at 3). However, HALLEX I-2-3-20, sets forth ways in which the Agency notifies claimants that it received their notice of hearing forms; it does not modify the way the ALJs write their decisions. See SOCIAL SECURITY HALLEX I-2-3-20, *Acknowledgment of Notice of Hearing*, https://www.ssa.gov/OP_Home/hallex/I-02/I-2-3-20.html (last visited 4/27/2022). Nonetheless, Walker has not argued how those changes made it more or less likely that his application would be denied. Finally, Walker argues that he did not receive "constitutionally valid" decisions by the ALJ and the Appeals Council. Walker fails to explain the basis for these arguments. To the extent Walker again asserts a challenge to Mr. Saul's delegation authority, this challenge fails under *Collins*, as discussed above.[2]

None of Walker assertions describe the type of compensable harm stemming from an unconstitutional removal provision that was described in *Collins*. Walker does not state that when his application was pending the President was unable to remove Saul from office or believed that he was unable to do so. *Collins*, 141 S. Ct. at 1789. Walker does not describe how he was harmed at the time of the ALJ's decision in March 2020 or when the Appeals Council denied his request for review in September 2020. Without a harm traceable to an unlawful action by the Commissioner, Walker does not have standing to challenge the constitutionality of § 902(a)(3). *See Rives*, 2022 WL 1076216, at *22-23.

Accordingly, Walker's constitutional challenge fails because he "has not described compensable harm due to the unconstitutional removal provision in § 902(a)(3) under which

---

[2] To the extent his argument could be viewed as an Appointments Clause challenge, Walker emphasized in his reply brief that he is not raising an Appointments Clause challenge. (ECF No. 21 at 4).

15

Saul served as Social Security Commissioner." *Lynch v. Comm'r of Soc. Sec.*, No. 1:21CV0556-JDG, 2022 WL 614777, at *17 (N.D. Ohio March 2, 2022); *Miley,* 2021 WL 6064754, at *1 (N.D. Ohio Dec. 22, 2021) ("[plaintiff] lacks standing to contest the constitutionality of the ALJ's decision based on the president's removal authority").[3]

The Commissioner also argues that Walker's request for relief under *Seila Law* fails under other legal and equitable doctrines, including harmless error, de facto officer, the rule of necessity, and broad prudential considerations. (ECF No. 19 at 11-14.) Because this Court concludes that Walker does not have standing and this Court lacks jurisdiction to hear the relevant constitutional arguments, these additional arguments will not be addressed herein.

Having determined that Claimant does not have standing to assert the constitutional error in his first issue, the Court now turns to Claimant's second issue for review: whether the ALJ erred at step two by finding that Claimant did not have any severe impairments.

**2.  The ALJ's decision at Step Two was supported by substantial evidence.**

"At Step Two of the sequential analysis, claimant has the burden of proving he has a severe medically determinable impairment, in order to establish disability within the meaning of the Act." *Dowey v. Comm'r of Soc. Sec.*, No. 5:17CV2489, 2018 WL 7681369, at *3 (N.D. Ohio Dec. 21, 2018) (citations omitted), *report and recommendation adopted sub nom. Dowey v. Berryhill*, No. 5:17CV2489, 2019 WL 580570 (N.D. Ohio Feb. 12, 2019); *Higgs v. Secretary, HHS*, 880 F.2d 860, 862-863 (6th Cir. 1988). "In the Sixth Circuit, the severity determination is 'a de minimis hurdle in the disability determination process.'" *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (quoting *Higgs*, 880 F.2d at 862). "[A]n impairment can be considered

---

[3] Despite Claimant's counsel in *Miley* and *Lynch* being the same as in the case at bar, no appeal was taken by Miley or Lynch to the Court of Appeals.

not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education and experience." *Id.* "The goal of the test is to 'screen out totally groundless claims.'" *Id.* (quoting *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985)). "A physical or mental impairment must be established by 'medical evidence consisting of signs, symptoms, and laboratory findings,' not simply by claimant's statements of symptoms." *Dowey*, 2018 WL 7681369, at *3 (quoting *Long v. Apfel*, No. 99-6426, 2001 WL 45105, at *4 (6th Cir. Jan. 9, 2001) (quoting 20 C.F.R. § 416.908)). "The evaluation of disability may properly terminate at Step Two upon a finding that claimant has not carried his burden, or that the impairments are not severe." *Id.* (citing *Williamson v. Secretary, HHS*, 796 F.2d 146, 151 (6th Cir. 1986) (citing *Gist*, 736 F.2d at 357-358); *see also Long*, 2001 WL 45105, at *5).

The ALJ's Step Two analysis was as follows, in relevant part:

**4.   Through  the  date  last  insured,  the  claimant  did  not  have  an impairment   or combination of impairments that significantly limited the ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant did not have a severe impairment or combination of impairments (20 CFR 404.1521 et seq.).**

[* * *]

The claimant's testimony focused primarily on headaches, which he states have been present since he was in his 20s. While the record does support a diagnosis of headaches/migraines, there is simply no evidence of any more than minimal limitations related thereto during the relevant time period.

A CT of the claimant's brain performed in February 2000, showed no evidence of focal findings (Exhibit 3F/281). Subsequently, in July 2003, the claimant presented to the VA complaining of headaches, which he associated with head trauma while in the service (Exhibit 7F/185). At that time, he reported getting headaches "a couple of times every month," lasting 6 hours with associated photophobia (Exhibit 7F/185). He denied any other symptoms, including diploma and dizziness. It was noted that he was under some stress, studies extensively, and "does not believe in taking meds as doesn't want to take any meds for H/A" (Exhibit 7F/185). A physical examinations [sic] showed the claimant to be alert, fully oriented, an [sic] in no acute distress, with a supple neck without tenderness. He was assessed with "H/A" and referred to neurology (Exhibit 7F/186).

17

In October 2003, the claimant presented "for the first time" to the neurology outpatient clinic through the VA (Exhibit 7F/168). At that time, he reported having headaches since 1992, which worsened since 1998. He reported a few prior black out episodes, but it was not noted when, and he denied dizziness and lightheadedness. It was noted that he was going to school through the VA. A physical examination showed the claimant to be alert and fully oriented, with normal speech and language, symmetric face, 5/5 strength in all four extremities, normal muscle tone and reflexes, intact sensations in all extremities, no pronator drift, intact coordination, and a normal gait (Exhibit 7F/169). It was noted that the claimant's reported chronic daily headaches were most consistent with migraine headaches. No cause for repeated imaging studies were found, as his "headaches have not really changed much in intensity and nature" (Exhibit 7F/169). He was started on Nortriptyline 25mg, which was noted would be increased to 50 mgs two weeks later, and 75mg two weeks after that, as well as Motrin 400mg (Exhibit 7F/169).

In February 2004, the claimant returned to the VA for a neurological headache follow up, at which time it was noted he was restarted on Nortriptyline in October 2003, "which relieved his headaches" (Exhibit 3F/114). A physical examination performed at that time showed the claimant to be alert, with normal speech, 5/5 strength, normal muscle tone and strength, normal coordination, and a normal gait (Exhibit 3F/114). His "chronic daily headaches" were noted to be "well controlled" since last visit in October 2003, and he was informed that he could get his headache medication from his primary care physician, since his headaches were "stable" (Exhibit 3F/114).

Based upon the above, the undersigned finds that the claimant's headaches/migraines were nonsevere during the relevant time period, as they were responsive to treatment and caused no more than minimally vocationally relevant limitations, (20 CFR 404.1521 and Social Security Rulings (SSRs) 85-28, 96-3p, and 96-4p). Such determination is supported by the normal imaging findings, the normal physical examination findings, and the clear evidence of improvement/resolution of his headaches/migraines with conservative treatment.

The claimant also alleges disability due, in part, to spinal problems. While the record does support low back pain/minimal osteoarthric changes and minimal lumbar bulging and loss of height and signal at L4-5, there is simply no evidence of any more than minimal limitations related thereto during the relevant time period. Specifically, lumbar studies performed in February 2000 were "normal" (Exhibit 3F/282). A MRI of the claimant's lumbar spine performed in April 2002, showed completely normal findings (Exhibit 3F/113, 276). Subsequently, a MRI of the claimant's lumbar spine performed in November 2003, showed a large hemangioma within the T11 vertebral body, "minimal" loss of height and signal at the L4- L5 intervertebral level, and "minimal" bulging at L4-L5, with no fractures, no canal or foraminal narrowing (Exhibit 3F/113). This study was in

interpreted as "unremarkable" (Exhibit 3F/149). A repeated MRI performed in December 2003, showed no change and was again noted to be "unremarkable" (Exhibit 3F/272).

In March 2003, the claimant presented to the VA for low back pain (Exhibit 7F/176). However, he reported that "he is very strong in his back" and he refused to take any medications for it (Exhibit 7F/175). He also reported that he was taking MSM and glucosamine and chondroitin sulfate which he reported helped his pain (Exhibit 7F/175). A full physical examinations [sic] performed at that time showed the claimant to be in no acute distress, with 5/5 strength and normal sensations (Exhibit 7F/176). It was noted that he presented with an antalgic gait, but it was specifically noted, "this seems to be a robotic antalgia, as he moves very slowly to demonstrate his amount of pain" (Exhibit 7F/176). The only assessed made was chronic low back pain" and no medications were provided (Exhibit 7F/176).

In September 2003, the claimant returned to the VA for low back pain (Exhibit 7F/167). He reported experiencing pain, which he associated to his military service and episodic bowel incontinence (Exhibit 7F/167). At that time, it was noted that x-rays revealed normal disk spaces and "minimal" osteoarthric changes (Exhibit 7F/167). He subjectively reported some slight numbness in the L4 distribution, but a physical examinations [sic] showed intact sensations throughout, intact 5/5 strength throughout, no sacroiliac joint tenderness, and negative straight leg rises (Exhibit 7F/167). He had "diffuse tenderness" over his back and it was noted that he had a very antalgic gait (Exhibit 7F/167). However, as detailed above, just one month later, in October 2003, and again in February 2004, the claimant was assessed with a normal gait (Exhibits 3F/113 and 7F/168). The only assessment made at that time was "low back pain" and physical therapy, exercise, and anti-inflammatories were recommended (Exhibit 7F/168). It was specifically noted that his provider informed him that his examination and imaging studies did not show any evidence of compression or impingement of his nerves, and that it did not appear that his reported episodes bowel incontinence was not coming from his back (Exhibit 7F/168).

Subsequently, in October 2004 (seven months after the date last insured), the claimant presented for a physical therapy consult through the VA (Exhibit 3F/112). At that time, he reported pain with long sitting, walking, and lifting weight "about 100lbs like holding shingles over the shoulder" but he stated that he was not taking any medications for his reported back pain (Exhibit 3F/113). It was noted that he appeared with a cane, and despite reporting pain with long sitting, it was noted that the claimant waited for several hours for his appointment and sat in one place for most of the time (Exhibit 3F/113). A physical examination showed that the claimant could walk on his tiptoes and heels most of the time and squat with little difficulty. He had 5/5 strength, negative straight leg rises, and a positive Wadell sign with axial loading and "sham rotation of spine" (Exhibit 3F/113). Based upon these findings, he was referred to physical therapy

and neuropsychological testing to rule out nonorganic causes of his lower back pain (Exhibit 3F/113).

Based upon the above, the undersigned finds that the claimant's lumbar condition was nonsevere, as it was responsive to very conservative treatment, caused no more than minimally vocationally relevant limitations, and/or did not last at a severe level for a continuous period of 12 months (20 CFR 404.1521 and Social Security Rulings (SSRs) 85-28, 96-3p, and 96-4p). Such determination is fully supported by the imaging studies showing normal to no more than minimal findings. It is further supported by the claimant's very conservative treatment, with reports that his symptoms improved with over the counter medications. It is also supported by the physical examinations, which routinely showed intact strength and sensations. While he was on occasion noted to have some gait abnormalities, the evidence suggests symptom magnification, as the imaging studies showed no cause for an abnormal gait, his physical examinations routinely showed intact lower extremity strength, he was assessed with a normal gait in between his assessments of an abnormal gait, and his providers reported evidence suggestive of exaggerated pain behaviors in March 2003 and October 2004. Overall, the evidence does not support more than minimal limitations related to his lumbar condition during the relevant time period.

(ECF No. 13, PageID #: 90-92).

Walker argues that the Step Two analysis is intended to be merely a "de minimis hurdle" in the disability determination process. (ECF No. 16 at 10 (citing *Halcomb v. Bowen*, 819 F.2d 289 (Table), 1987 WL 36064, *3 (6th Cir. 1987)). Indeed, in *Higgs v. Bowen*, the Sixth Circuit stated that "the step two severity regulation codified at 20 C.F.R. §§ 404.1520(c) and 404.1521 has been construed as a de minimis hurdle in the disability determination process." 880 F.2d 860, 862 (6th Cir. 1988) (citing cases). However, *Higgs* noted as well that "the severity requirement may still be employed as an administrative convenience to screen out claims that are 'totally groundless' solely from a medical standpoint." *Id*. at 862-863. In fact, the court in *Higgs* found that the case before it had properly been dismissed, because there was "nothing in the objective medical record credibly suggesting that [claimant] was significantly affected by any of her impairments on or before [the date her disability insurance coverage lapsed]." *Id*.

The Sixth Circuit has since confirmed that the claimant's burden must still be satisfied at

20

Step Two:

> It is true that this court has characterized step two of the disability
> determination process as a "de minimis hurdle." *See, e.g., Higgs v.
> Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). "[A]n impairment can
> be considered not severe only if it is a slight abnormality that
> minimally affects work ability regardless of age, education, and
> experience." *Id.* Nevertheless, a claim may be dismissed at step
> two if it is determined that the claim is " 'totally groundless' solely
> from a medical standpoint." *Id.* at 863 (quoting *Farris v. Sec'y of
> Health & Human Servs.*, 773 F.2d 85, 89 n. 1 (6th Cir. 1985) ). To
> surmount the step two hurdle, the applicant bears the ultimate
> burden of establishing that the administrative record contains
> objective medical evidence suggesting that the applicant was
> "disabled," as defined by the Act, on or prior to the date that the
> applicant was last insured. See id. The Act defines "disability" as
> the "inability to engage in any substantial gainful activity by
> reason of any medically determinable physical or mental
> impairment which can be expected to result in death or which has
> lasted or can be expected to last for a continuous period of not less
> than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security
> regulations interpret § 423(d)(1)(A) to require the existence of a
> "severe" impairment — that is, "any impairment or combination of
> impairments which significantly limits [the claimant's] ability to
> do basic work activities." 20 C.F.R. § 404.1520(c).

*Despins v. Commissioner*, 257 F. App'x 923, 929 (6th Cir. 2007); *see also Long v. Apfel,* 1 F.

App'x 326, 331 (6th Cir. 2001) (collecting cases).

Walker argues that the ALJ "failed to adequately discuss" certain evidence relating to his

headaches, back and ankle issues, and PTSD, and that this evidence established the existence of

severe impairments. (ECF No. 16 at 10). Specifically, Walker cites to records from Dr. Richard

Tsai at Blackhawk Chiropractic and from the VA clinic/hospital, stating that these records

establish that Walker suffered from "impairments which affected Walker's ability to work."

(ECF No. 16 at 11). It is the claimant's burden at Step Two to show that the administrative

record contains objective medical evidence that he suffers from a severe medically determinable

impairment, on or prior to the date that the applicant was last insured. *Despins*, 257 F. App'x at

929. Here, the ALJ did not err in finding that Claimant failed to prove that he suffered from more than slightly or minimally impairing ailments before his DIB coverage lapsed. *See Higgs*, 880 F.2d at 863.

With respect to Claimant's left ankle, the ALJ noted that x-rays taken in April 2000, March 2001, and March 2002 were normal. (ECF No. 13, PageID #: 87). The ALJ also addressed Claimant's knee impairment and stated that x-rays of his left knee in March 2001 were normal. (ECF No. 13, PageID #: 87). Claimant asserts that the ALJ failed to consider that on February 14, 2001, a physician at the VA found that he had edema in his extremities (ECF No. 16 at 10) and that he had appeared at times with an antalgic gait (ECF No. 16 at 12 (citing Tr. 937, 966)[4]). The full language of the notation states: "EXTREMITIES:- edema, left ankle exam reveals good ROM, he complains of tenderness on palpation on medial aspect, no swelling or skin changes, knee exam revealed full ROM, no swelling, no crepitens [sic], lower back exam revealed some tenderness mid spine area, straight leg elevation is not restricted or associated with any [symptoms], sensory and motor is intact in both lower [extremities]". It is unclear from this note whether Claimant had edema as the description states that "no swelling" existed in both his ankle and his knee and the notation fails to explain the location of the edema. Nonetheless, "it is well settled that an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) (internal quotation marks and citation omitted). Here, the ALJ discussed objective medical tests that showed nothing abnormal about Claimant's ankle.

---

[4] The references Claimant cites to actually appear at transcript pages 935 ("The patient's gait is antalgic; however, this appears to be robotic antalgia as he moves very slowly to demonstrate his amount of pain.") and 965 ("Patient walks short to moderate distances with a circumducted type gait."). (ECF No. 13-1, PageID #: 1004, 1034).

Additionally, the ALJ specifically addressed Claimant's gait stating that "[i]t was noted that he presented with an antalgic gait, but it was specifically noted, 'this seems to be a robotic antalgia, as he moves very slowly to demonstrate his amount of pain' (Exhibit 7F/176)." (ECF No. 13, PageID #: 91). The ALJ also noted that "[w]hile he was on occasion noted to have some gait abnormalities, the evidence suggests symptom magnification, as the imaging studies showed no cause for an abnormal gait, his physical examinations routinely showed intact lower extremity strength, he was assessed with a normal gait in between his assessments of an abnormal gait, and his providers reported evidence suggestive of exaggerated pain behaviors in March 2003 and October 2004." (ECF No. 13 at 92). Accordingly, the decision clearly demonstrates that the ALJ considered objective medical evidence regarding Claimant's gait.

With respect to Claimant's lumbar impairment, the ALJ explained that although the record "support[s] low back pain/minimal osteoarthritic changes and minimal lumbar bulging and loss of height and signal L4-5, there is simply no evidence of any more than minimal limitations related thereto during the relevant time period." (ECF No. 13 at 91). The ALJ proceeded to support this conclusion with objective medical evidence including normal lumbar studies from 2000, a normal MRI performed in April 2002, and "unremarkable" MRIs performed in November 2003 and December 2003. (ECF No. 13 at 91). Following a thorough review of Claimant's treatment related to his lumbar pain, the ALJ found that his lumbar impairment was non-severe:

> as it was responsive to very conservative treatment, caused no more than minimally vocationally relevant limitations, and/or did not last at a severe level for a continuous period of 12 months (20 CFR 404.1521 and Social Security Rulings (SSRs) 85-28, 96-3p, and 96-4p). Such determination is fully supported by the imaging studies showing normal to no more than minimal findings. It is further supported by the claimant's very conservative treatment, with reports that his symptoms improved with over the counter

> medications. It is also supported by the physical examinations,
> which routinely showed intact strength and sensations. While he
> was on occasion noted to have some gait abnormalities, the
> evidence suggests symptom magnification, as the imaging studies
> showed no cause for an abnormal gait, his physical examinations
> routinely showed intact lower extremity strength, he was assessed
> with a normal gait in between his assessments of an abnormal gait,
> and his providers reported evidence suggestive of exaggerated pain
> behaviors in March 2003 and October 2004. Overall, the evidence
> does not support more than minimal limitations related to his
> lumbar condition during the relevant time period.

(ECF No. 13 at 92). Claimant cites to no objective medical evidence that the ALJ failed to

consider in determining that Claimant's lower back impairment was non-severe.

Next, with respect to Claimant's PTSD, the ALJ found that Claimant had failed to

demonstrate a medically determinable impairment related to his mental health:

> The claimant also alleges disability due, in part, to several mental
> health issues; however, there is no evidence of any acceptable
> mental health diagnosis, no evidence of any objective abnormal
> mental health findings, and no evidence of any mental health
> treatment during the relevant time period. In February 2001, it is
> noted that a depression and PTSD screen was positive, but no
> specific objective findings were made and no mental diagnosis was
> made (Exhibit 7F/192). The claimant's representative points out
> that in a VA record dated March 2001, "pain disorder associated
> with both psychological and general medical condition" is listed,
> but just below such condition, it is noted that the code associated
> with that term was "inactive" and there is no evidence of any
> associated abnormal objective findings found at that time to
> support such condition (Exhibit 7F/3).
>
> In March 2003, the claimant's provider mentions that the claimant
> suffers from some psychiatric issues, but no objective abnormal
> mental findings were made and the only assessment/diagnosis
> made at that time was low back pain (Exhibit 7F/176). In February
> 2004, it was noted that the claimant "admits to symptoms of
> depression," but no abnormal mental findings were made and no
> mental diagnosis was made (Exhibit 3F/114). Subsequently, in
> May 2007, long after the date last insured, the claimant first
> presented for mental health care, at which time, he denied any
> previous mental health history (Exhibit 3F/234).

24

> Based upon the above, the undersigned find [sic] insufficient evidence to support a medically determinable mental health condition during the relevant time period, as there is simply no evidence of a mental diagnoses made by an acceptable medical source based upon an anatomical, physiological, or psychological abnormality that was shown by medically acceptable clinical and laboratory diagnostic techniques (SSR 06-3p).

(ECF No. 13, PageID #: 87-88). Although Claimant cites to certain subjective recitations in support of his argument, he includes no objective or clinical medical evidence supporting a severe impairment related to his PTSD for the insured period. Claimant submits that the VA's determination that he had a 100% disability for service-connected PTSD is evidence of a severe impairment. This determination was made in 2017 and applied retroactively to May 2011, well beyond the Claimant's date of last insured, March 31, 2004.[5] (ECF No. 13, PageID #: 801). Nonetheless, "[a] diagnosis alone [ ] says nothing about the severity of a condition." *Higgs*, 880 F.2d at 863. Here, the ALJ properly determined that there was insufficient evidence to support a medically determinable mental health condition during the relevant time period.

With respect to Claimant's headaches, the ALJ found that although the record supported "a diagnosis of headaches/migraines, there is simply no evidence of any more than minimal limitations related thereto during the relevant time period." (ECF No. 13, PageID #: 90). The ALJ supported this finding by citing to the objective medical evidence including a CT scan of Claimant's brain taken in 2000, which showed "no evidence of focal findings[.]" (ECF No. 13, PageID #: 90). The ALJ discussed Claimant's treatment for his headaches and the medical notations that the chronic daily headaches were "well controlled" with medications. (ECF No. 13, PageID #: 90). The ALJ found that Claimant's "headaches/migraines were nonsevere during

_____

[5] Prior to the 2017 determination, Claimant's service-related PTSD disability rating was 30%. (ECF No. 13, PageID #: 801).

the relevant time period, as they were responsive to treatment and caused no more than minimally vocationally relevant limitations, (20 CFR 404.1521 and Social Security Rulings (SSRs) 85-28, 96-3p, and 96-4p)." (ECF No. 13, PageID #: 91). The ALJ explained that "[s]uch determination is supported by the normal imaging findings, the normal physical examination findings, and the clear evidence of improvement/resolution of his headaches/migraines with conservative treatment." (ECF No. 13, PageID #: 91-92). Claimant cites to no objective medical evidence that the ALJ failed to consider in determining that Claimant's headaches/migraines were a non-severe impairment.

As the ALJ explained, for each of the alleged impairments, there are no objective medical or clinical findings to substantiate that Claimant's ailments more than minimally impaired his ability to work through the date last insured.

Claimant also argues that the ALJ failed consider his symptom testimony and function report in violation of SSR 16-3p. (ECF No. 16 at 13). The evaluation of a claimant's subjective complaints rests with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers*, 486 F.3d at 248 (noting that "credibility determinations regarding subjective complaints rest with the ALJ"). In evaluating a claimant's symptoms, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304. Beyond medical evidence, SSR 16-3p sets forth seven factors that the ALJ should consider. The ALJ need not analyze all seven factors but should show that she considered the relevant evidence. *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005). "[I]f an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, we will

26

determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities or abilities to function independently, appropriately, and effectively in an age-appropriate manner." SSR 16-3P, 2017 WL 5180304. The ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304; *see also Felisky v. Bowen*, 35 F.2d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so."). While a reviewing court gives deference to an ALJ's credibility determination, "the ALJ's credibility determination will not be upheld if it is unsupported by the record or insufficiently explained." *Carr v. Comm'r of Soc. Sec.*, No. 3:18CV1639, 2019 WL 2465273, at *10 (N.D. Ohio April 24, 2019) (citing *Rogers*, 486 F.3d at 248-49), report and recommendation adopted by 2019 WL 3752687 (N.D. Ohio Aug. 8, 2019).

The ALJ specified Claimant's subjective complaints:

> The claimant initially alleged disability due to multiple issues, including head injuries affecting speech and concentration, nervous condition, anxiety, spinal problems, trauma to the right ear, ringing in both ears, PTSD, depression, heart problems, neurogenic shock, left leg and knees lock up, bowel problems, social anxiety, stomach problems, metabolic problems, extremely sensitive to light, severe itching, and trouble sleeping (Exhibit 3E). He submitted a Function Report wherein he reported difficulties lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, stair climbing, seeing, remembering, completing tasks, concentrating, understanding, following instructions, using his hands and getting along with others (Exhibit 4E). He endorsed musculoskeletal, cognitive, and neurological issues, causing him chronic pain, a perpetual concussed state, and decreased concentration (Exhibit 4E).
>
> At the hearing, the claimant testified that he is married and currently lives with his wife. He stated that he has a driver's

license and drives once or twice a week as needed. He endorsed a
BA in Education and a history of military service. The claimant
testified that he has suffered from headaches since his early 20s.
During the relevant time period, he stated that his headaches never
let up and caused sensitivity to light. He testified that he had good
days and bad days, and that at times he could not get out of bed,
due to his pain. He endorsed his headaches occurring three to four
times a week. He further stated that, at one point his medications
seemed to be helping, but they caused him to have very bad violent
dreams. He stated that he has never slept well and does not sleep
through the night.

The claimant also endorsed an ankle fracture. He stated that if it
locks up, he hits the ground hard. When questioned how often his
occurs, the claimant stated once or twice a month. He also stated
that he twisted his back up and that he used a cane, but hide it from
others. He also endorsed difficulties concentrating since 2000,
stating that he kept notes in his pocket to help him remember
things. He testified that while getting his Master's Degree, he had a
breakdown and did not report it. He endorsed chest anxiety and
crying spells, but stated that he hide it from everyone. Due to his
conditions, he stated that he did not do anything around the house.

(ECF No. 13, PageID #: 89). Next, the ALJ provided a unified statement of reasons for

discounting credibility:

After considering the evidence of record, the undersigned finds
that the claimant's medically determinable impairments could have
reasonably been expected to produce the alleged symptoms;
however, the claimant's statements concerning the intensity,
persistence and limiting effects of these symptoms are not entirely
consistent for the reasons explained in this decision.

(ECF No. 13, PageID #: 89-90).

The ALJ then discussed at length the objective medical evidence. (*See* ECF No. 13,

PageID #: 90-92). For example, the ALJ noted that despite Claimant's complaints of headaches,

he reported getting them only a couple times a month and that once Claimant took medications,

his headaches were "well controlled[.]" (ECF No. 13, PageID #: 90). Despite claims of back

pain, the ALJ noted that although Claimant "presented with an antalgic gait, but it was

specifically noted, 'this seems to be a robotic antalgia, as he moves very slowly to demonstrate

his amount of pain' (Exhibit 7F/176). The only assessed [sic] made was chronic low back pain[ ] and no medications were provided (Exhibit 7F/176)." (ECF No. 13, PageID #: 91). Additionally, the ALJ noted that in 2003, Claimant "reported that 'he is very strong in his back' and he refused to take any medications for [his low back pain] (Exhibit 7F/175)." (ECF No. 13, PageID #: 91). With respect to his complaints of mental ailments, the ALJ noted the lack of any diagnosis or treatment during the insured period and Claimant's own denial of mental health history prior to 2007. (ECF No. 13, PageID #: 87-88).

The ALJ also discussed Claimant's prescription medications and noted side effects or the lack thereof. (E.g. ECF No. 13, PageID #: 90-91).

After a thorough examination of Claimant's treatment and medications for each of the alleged ailments, the ALJ explained why the objective medical evidence did not support Claimant's assertion that they more than minimally interfered with his ability to work. (*See* ECF No. 13, PageID #: 87, 90-92). By way of summary, the ALJ concluded that "the objective medical evidence clearly shows that that the claimant did not have an impairment or combination of impairments that significantly limited his ability to perform basic work activities during the relevant time period." (ECF No. 13, PageID #: 92).

Claimant asserts that the ALJ failed to consider his function report and symptom testimony. However, as quoted above, the decision provides a detailed summary of the function report and Claimant's symptom testimony. Ultimately, however, in light of the objective medical evidence specifically detailed by ALJ, the ALJ found that the severity of Claimant's complaints were not consistent with the objective medical record.

The ALJ's decision satisfies the Court that the ALJ considered all of the relevant evidence and that a reasonable mind might accept that evidence as adequate to support the ALJ's

credibility finding. There exists, therefore, no compelling reason for the Court to disturb that finding. *Cross,* 373 F. Supp. 2d at 732.

Here, the objective medical evidence supports the ALJ's finding that Claimant's ailments no more than minimally affected his ability to work. Additionally, the ALJ properly found that Claimant's symptom testimony regarding the severity of his ailments is inconsistent with and unsupported by the objective medical evidence.

Accordingly, this Court finds that the ALJ's decision at Step Two was supported by substantial evidence.

## VI. Conclusion

Based on the foregoing, the Court AFFIRMS the Commissioner's final decision denying Walker Disability Insurance Benefits.

Dated: April 28, 2022

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE